**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 200495-U

Order filed February 10, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* A.B., | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| A minor | ) | Kankakee County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-20-0495 |
| | ) | Circuit No. 19-JA-31 |
| v. | ) | |
| | ) | |
| Ryan B., | ) | Honorable |
| | ) | J. Imani Drew, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE McDADE delivered the judgment of the court.
Justices Daugherity and Lytton concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The findings in trial court's dispositional order were not contrary to the manifest weight of the evidence.

¶ 2     Respondent, Ryan B., appeals following the trial court's entry of a dispositional order in which it adjudicated A.B. a ward of the court and placed her in the custody of the Department of Child and Family Services (DCFS). Respondent contends that the court's findings that he was

unable to care for A.B., and that it was in A.B.'s best interests to be placed in DCFS custody, were contrary to the manifest weight of the evidence. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4        On October 29, 2019, the State filed a petition alleging that A.B. was a neglected minor in that she was born on October 15, 2019, and her meconium tested positive for "marijuana and/or opiates." The petition requested that A.B. be made a ward of the court. It identified Samantha M. as A.B.'s mother and respondent as A.B.'s father.

¶ 5        In an accompanying petition for temporary custody, which was granted the same day, the State alleged that Samantha M. tested positive for "marijuana and/or opiates" and admitted to recently consuming heroin and marijuana. It further alleged that A.B. was the fourth substance-exposed infant born to Samantha M., that she and respondent had failed to complete service objectives in two other neglect cases, and that she and respondent reported no stable residence. The trial court granted the petition for temporary custody, and A.B. was placed with respondent's mother, Sandra B.

¶ 6        On January 3, 2020, social services agency One Hope United filed a report. The report indicated that respondent had gained employment with a heating and cooling company and was visiting A.B. regularly. A.B. was safe and "doing well."[1] A permanency goal of return to home in 12 months was recommended.

¶ 7        The court held an adjudicatory hearing on February 10, 2020. Based on Samantha M.'s stipulation, the court found A.B. abused or neglected. Following that finding, counsel for

---

[1]The report, like the others throughout the record, also detailed Samantha M.'s progress. Because Samantha M. is not a party to this appeal, discussion of her progress will be omitted except where relevant to respondent. Likewise, the reports on the record also discuss A.B.'s twin three-year old siblings, children of respondent and Samantha M. who were also placed with Sandra B. As the present appeal concerns only A.B., discussion of the older siblings will be omitted.

2

respondent indicated that he would be filing a motion for increased visitation because Sandra B. had filed an order of protection against respondent. No further details were provided.

¶ 8    One Hope United filed its next report on February 28, 2020. That report indicated that respondent had stable housing. Respondent's apartment was found to be furnished, safe, and suitable for children. Respondent had been referred for parenting classes and a mental health assessment. Respondent and Samantha M. were visiting A.B. and her siblings five days a week "until the restraining order was put into effect." Subsequently, visits were held once per week at a DCFS office. Respondent and Samantha M. had not missed a scheduled visit. Further, the report noted that "[d]uring the visits, both parents completely take care of all the children's needs, including changing diapers, feedings and engaging affectively [*sic*]." The report recommended a goal of return to home in 12 months.

¶ 9    A DCFS service plan was filed the same day. Among the action steps prescribed for respondent were: full participation in assessments, evaluation, and counseling; cooperation with any recommendations following that participation; demonstration of progress on the issue of mental health; cooperation with requested blood and urine tests; completion of parenting classes; provision of stable housing; and to "not allow [Samantha M.] to reside in resident [*sic*] or visit when children are present." The plan also listed as a desired outcome that respondent "[m]aintain an alcohol/drug free level of personal functioning in order to provide a safe, adequate, and nurturing environment for children."

¶ 10    DCFS next filed a permanency hearing report on June 30, 2020. The report indicated that respondent had failed to make satisfactory progress or reasonable efforts toward the goal of A.B. returning to home. The report noted that respondent had failed to schedule a psychological evaluation or enroll in parenting classes. Further, respondent failed to appear for a requested drug

test. He had yet to provide documentation of his employment. The report observed that Sandra B. was meeting all of A.B.'s needs and that there were no concerns for A.B.'s development. The recommended permanency goal was substitute care pending court determination on termination of parental rights. The accompanying updated service plan also noted that respondent was inconsistent in his contact with the caseworker.

¶ 11 One Hope United filed a report on July 10, 2020. That report indicated that respondent was "not engaged with services at this time that the agency could verify." Respondent reported scheduling therapy sessions and taking parenting classes, but his account could not be confirmed. Respondent had also failed to verify his employment. The report indicated that respondent tested positive for THC in January and missed a drug test in April.

¶ 12 The One Hope United report also provided details relating to the order of protection obtained by Sandra B. Per the report, respondent had made violent threats toward Sandra B. and had also engaged in "domestic violence disputes" with Samantha M. while visiting the children in Sandra B.'s home. An older child reported that respondent was throwing and breaking things while threatening to "slice [Sandra B.'s] throat."

¶ 13 The report stated that Samantha M. had fully disengaged from services. She had violated probation and a warrant was out for her arrest. She had not been in contact with the caseworker within the last month.

¶ 14 An order entered on August 6, 2020, found that respondent "has cooperated with DCFS and has made progress toward the goal of reunification." The order also provided DCFS with discretion to allow respondent to have unsupervised, non-overnight visitation with A.B.

¶ 15 A court-appointed special advocate filed a report on September 20, 2020. The report found that A.B.'s foster home was safe and appropriate, and that Sandra B. was meeting all of

4

her developmental needs. The report stated that Samantha M. had been arrested for parole violations, released on bond, and another warrant had issued following a failure to appear in court. Of the most recent arrest, the report stated: "[Samantha M.] was taken into custody this last time while driving [Ryan B.'s] father's vehicle, which points to the fact that she might be in contact regularly with [respondent]." The court-appointed special advocate recommended that A.B., and her siblings, remain in Sandra B.'s care.

¶ 16    DCFS filed its next permanency report on October 2, 2020. The report indicated that respondent was appropriately engaged in counseling services. He attended parenting classes and the agency was able to verify his housing. Respondent was scheduled to submit to a drug test on July 1, 2020, but failed to appear. As to visitations, the report noted that visits were

> "[s]upervised because father has just started engaging in services and has not completed services yet. The agency is working on a plan to begin unsupervised visits for father. At this time mother has no visitation plan due to being detained and upon release she has not had any communication with the agency."

The report recommended a permanency goal of return to home in 12 months, noting that respondent was progressing toward that permanency goal, but needed to "make some more progress."

¶ 17    An updated service plan filed in conjunction with the permanency report indicated that respondent had begun counseling, but that DCFS had not received a progress report indicating whether specific concerns were being addressed therein.

¶ 18    One Hope United filed a report on October 23, 2020. With respect to Samantha M., the report indicated that an unnamed source had brought one of a Samantha M.'s children—not one

5

she shared with respondent—to her house to visit Samantha M.. Per the source, respondent was at Samantha M.'s home at the time. Subsequently, Samantha M.

> "left the child with [respondent] and went out to get high off heroin. She allegedly overdosed at a friend's house. [SOURCE] [*sic*] went to pick the child up after a couple of hours and [respondent] informed [SOURCE] that a friend of mother's *** had taken the child at the mother's request. Attempt[s] to locate and return the child to [SOURCE] have been unsuccessful."

¶ 19    The report indicated that respondent had completed parenting classes. As to respondent's visitation, the report stated:

> "The caseworker received a report that from the first overnight the baby was returned late at 5:20 p.m. The next weekend visits [*sic*] the baby was returned poop [*sic*] all the way through her clothes. She was returned late again due to [respondent] and the baby falling asleep together. She was not able to go to bed at her normal time due to this extra nap."

The report showed that A.B.'s medical, dental, and vision care were "up to date."

¶ 20    A combined permanency review and dispositional hearing was held on October 27, 2020. At the hearing, the State clarified that the unnamed source in the most recent One Hope United report was the grandmother and guardian of the child in question. The State informed that court that Samantha M.'s presence around respondent, and potentially A.B., was "a huge concern." The guardian *ad litem* expressed concern that respondent apparently returned the child to a third party, rather than the person he knew to be the guardian. Counsel for respondent stated that respondent denied the allegation that he was spending time with Samantha M.

¶ 21    The court observed that it had yet to be provided with a transition plan for A.B.'s return to home.[2] It also asked the caseworker what One Hope United was doing to assist respondent in returning A.B. from visits in a timely manner. The caseworker noted that respondent had been referred to, and completed, parenting classes, and that she had continuing discussions with him about timeliness.

¶ 22    The court found that it was in the best interests of A.B. to make her a ward of the court. It found that respondent was "unable at this time to take the child as more time is needed for a transition." The court continued: "[H]e's gonna have the child – we're gonna start with two nights or whatever the transition plan is, okay?"

¶ 23    The written dispositional order, naming A.B. a ward of the court, indicated the respondent was unable to care for, protect, train, educate, supervise or discipline A.B. for the reason that he "need[ed] more time to prepare for the minor being returned home." The order named DCFS the continued custodian and guardian of A.B. and indicated that that placement was consistent with the A.B.'s health, welfare, safety, and best interest. A permanency order filed the next day showed a goal of return to home within five months.

¶ 24    A transitional plan filed on November 17, 2020, listed 28 steps to be completed prior to A.B.'s return to respondent's home. These steps included gradually increasing overnight visitation, continued drug testing, review of respondent's home and living situation, daycare and backup care planning, and a domestic violence evaluation.

¶ 25    Respondent filed a notice of appeal on November 19, 2020.

¶ 26                                  II. ANALYSIS

---

[2]The court noted that it had previously requested the transition plan. The record on appeal contains reports of proceedings from only the adjudicatory hearing (February 10, 2020) and the dispositional hearing (October 27, 2020).

7

¶ 27    On appeal, respondent argues that the court's findings that respondent was unable to care for A.B., and that placement in the custody of DCFS was in A.B.'s best interests, were contrary to the manifest weight of the evidence. Respondent raises no issue with respect to the court's adjudication of A.B. as a neglected minor or its determination that A.B. be made a ward of the court.

¶ 28    Pursuant to the Juvenile Court Act of 1987 (Act), once a child is adjudicated neglected, the court must hold a dispositional hearing to determine whether it is in the child's best interests to be made a ward of the court. 705 ILCS 405/2-21, 2-22 (West 2018). If the child is made a ward of the court, the court must then determine the disposition best serving the health, safety and interests of the minor and the public. *Id*. § 2-22. Four types of dispositional orders are contemplated by the Act:

> "(1) continued in the custody of [the child's] parents, guardian or legal custodian; (2) placed in accordance with Section 2-27; (3) restored to the custody of the parent, parents, guardian, or legal custodian, provided the court shall order the parent, parents, guardian, or legal custodian to cooperate with [DCFS] and comply with the terms of an after-care plan or risk the loss of custody of the child and the possible termination of their parental rights; or (4) ordered partially or completely emancipated[.]" *Id*. § 2-23(1)(a).

¶ 29    Section 2-27 of the Act, in turn, holds that a child adjudicated a ward of the court may be placed in the custody of DCFS where the court finds that (1) the parents are unfit or unable to care for, protect, train or discipline the minor, and (2) the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents. *Id*. § 2-27(1).

8

¶ 30       We will not disturb a trial court's dispositional order unless the findings therein are contrary to the manifest weight of the evidence or the court abused its discretion in selecting an inappropriate disposition. *In re A.S.*, 2014 IL App (3d) 130163, ¶ 21. Respondent asserts that the court's findings in this case were contrary to the manifest weight of the evidence but does not suggest that the disposition based on those findings was otherwise inappropriate. A finding is contrary to the manifest weight of the evidence "if the facts clearly demonstrate that the court should have reached the opposite result." *In re N.B.*, 191 Ill. 2d 338, 346 (2000).

¶ 31       Initially, we observe that respondent's argument on appeal is accompanied by a self-serving and incomplete review of the facts of the case. For instance, respondent asserts that "[e]very single report submitted to the Court *** demonstrates that the Dispositional Order *** was against the manifest weight of the evidence." This contention, like the fact section of respondent's brief, ignores the permanency hearing report of June 30, 2020, and the One Hope United report filed 10 days later. See *supra* ¶¶ 10-11. Those reports indicated that respondent had failed to make satisfactory progress or reasonable efforts toward the goal of A.B. returning home. Respondent had failed to schedule a psychological evaluation or enroll in parenting classes and One Hope United could not verify that he was engaged in any services. The permanency report even recommended that the goal be changed from return to home to substitute care pending court determination on termination of parental rights.

¶ 32       Similarly, respondent notes that his negative drug test of February 26, 2020, was an indicator of progress. Not mentioned in respondent's argument are his positive test from January 2020 and his missed tests in April and July. The DCFS service plan required respondent to submit to drug testing and to "[m]aintain an alcohol/drug free level of personal functioning in

9

order to provide a safe, adequate, and nurturing environment for children." Yet, the negative test from February 2020 is the only negative test reflected in the record.

¶ 33    Respondent's overarching contention is that he made substantial progress toward reunification with A.B. To be sure, his engagement with services appears to have improved markedly after the reports of June and July. We acknowledge his progress, as did the trial court, and as does the State on appeal. Nevertheless, it is error to conflate progress toward a goal with actual achievement of that goal.

¶ 34    As the State suggested at the dispositional hearing, respondent's continuing relationship with Samantha M. was cause for ongoing concern. The guardian *ad litem* and the court-appointed special advocate (*supra* ¶ 15) echoed those same concerns. From the outset, the service plan indicated that Samantha M. should not be present in respondent's home when A.B. or her siblings were there. Given respondent's history of "domestic violence disputes" with Samantha M. and her drug use, Samantha M.'s continued presence in respondent's life was problematic.

¶ 35    Still, the trial court's concern appears to have been not that respondent was *generally* unable to care for A.B., but that he was unable to do so immediately. The record reflects that, at the time of the dispositional hearing, respondent had not cared for A.B. for a period of time longer than a single overnight visit. The subsequently filed transition plan demonstrates the many issues that needed to be addressed in the months leading up to A.B.'s permanent placement with respondent.

¶ 36    In contrast to the lingering concerns about A.B.'s placement with respondent, the reports of the care A.B., and her siblings, were receiving from Sandra B. were unequivocally positive throughout the life of the case. "The overriding purpose of the Act to which all other goals are

10

subordinate is the 'best interest' of the minors involved." *In re Beatriz S.*, 267 Ill. App. 3d 496, 500 (1994). The trial court's conclusion that A.B. should remain in the safe, stable environment of Sandra B.'s home while gradually transitioning into placement with respondent—rather than being abruptly placed there following the hearing—is reflective of the overriding concern for A.B.'s best interests. The court's determination was not contrary to the manifest weight of the evidence and was fully consistent with letter and intent of the statute.

¶ 37                                      III. CONCLUSION

¶ 38        The judgment of the circuit court of Kankakee County is affirmed.

¶ 39        Affirmed.